**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>**v.**<br>**RICHARD BROWN** | **CRIMINAL NO. 26-0030** |

**Rufe, J.** **August 5, 2026**

**MEMORANDUM OPINION**

Defendant Richard Brown is charged in a one-count indictment with possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). Now before the Court is Defendant's motion to suppress the firearm. Upon consideration of Defendant's motion, the government's response thereto, and the evidence, testimony, and oral argument presented at the hearing held on July 14, 2026, and after further review of the hearing transcript, exhibits, and all body-worn camera footage, the Court now enters its findings of fact and conclusions of law.

## I. FINDINGS OF FACT[1]

1. On January 12, 2025, Philadelphia Police Department Officers Christian Irwin and Sean Johnson were on patrol in Patrol Assignment Area 4 of Philadelphia's 25th Police District, an area in North Philadelphia known for violent crime and illegal gun possession.[2] The officers each had roughly three years of patrol experience at the time of the stop.[3]

[1] The following factual findings are based on evidence presented at the suppression hearing of July 14, 2026, including testimony of Philadelphia Police Department Officers, body-worn camera footage of each officer, messages returned by the patrol car's Mobile Data System ("MDT"), and documentation pertaining to the stop and arrest to which the parties have stipulated.

[2] Suppression Hr'g Tr. ("Hr'g Tr.") at 7-9 [Doc. No. 41].

[3] *Id.* at 28, 120-21 [Doc. No. 41].

2. In the week prior, the officers recovered four illegally possessed firearms in the same Patrol Assignment Area.[4]

3. During their tour of duty, the officers were verifying whether vehicles were properly registered. Officer Johnson, seated in the passenger seat, accomplished these checks by inputting license plate numbers into the patrol car's Mobile Data Terminal ("MDT").[5]

4. Just after 8:20 p.m., they observed a silver Dodge Ram 1500 pickup truck affixed with a New York license plate numbered "LJX 2115" driving northbound on the 3600 block of Germantown Avenue.[6] The license plate did not exhibit physical damage or an unusual appearance.[7]

5. At 8:21 p.m., Officer Johnson input the truck's license plate number into the MDT, which returned an eleven-line "CAD report" reading "NO RECORD LIC/LJX 2155."[8] Eight lines down, the CAD report also read, "TEMPORARILY UNAVAILABLE: HOST COMMUNICATIONS FAILURE."[9]

6. Officer Irwin was driving when the CAD report came through, and Officer Johnson testified that he did not see the "TEMPORARILY UNAVAILABLE" message.[10] From their years of experience, the officers explained that a "NO RECORD" message is often associated with an expired license plate or an unregistered vehicle or, in certain cases, a vehicle

[4] *Id.* at 10.

[5] *Id.* at 121-22.

[6] *Id.* at 14, 89, 123.

[7] *Id.* at 50-51.

[8] Gov't Ex. G-1, MDT Reports ("Ex. G-1") at 20:21:12. For the sake of specificity, pincites denote the timestamp of the relevant CAD report entry instead of the page number.

[9] Hr'g Tr. at 21 [Doc. No. 41]; Ex. G-1 at 20:21:12.

[10] Hr'g Tr. at 39, 147 [Doc. No. 41].

that has been stolen or carjacked.[11] Specifically, Officer Irwin testified based on his experience that these so-called "NO RECORD" vehicles are found to be unregistered "[m]ost of the time."[12] Hence, they conducted a traffic stop and activated their body-worn cameras to capture the encounter.

7. Once the truck pulled over, Officer Irwin approached its driver's side by foot, where Defendant was seated, and Officer Johnson approached the passenger side, where a passenger was seated.[13]

8. It is undisputed that the truck had a New York registration sticker attached to the front windshield. The officers did not walk to the front of the truck to check the windshield stickers, noting it was "not common practice" to check for registration stickers on out-of-state cars.[14]

9. Officer Irwin explained the reason for the stop—that the on-board computer did not return a record for the truck—and Defendant replied that the truck was a rental.[15] Officer Irwin then asked three questions about firearms. First, Officer Irwin asked, "Either one of you guys licensed to carry?" to which Defendant replied, "I don't think so."[16] Second, as Defendant said "I don't think so," Officer Irwin asked, "No firearms inside the car?" and Defendant replied, "No."[17] Third, Officer Irwin asked, "You don't think so?" and Defendant appeared to say, "What

---

[11] *Id.* at 16, 124.

[12] *Id.* at 57.

[13] *Id.* at 25.

[14] *Id.* at 58.

[15] Gov't Ex. G-2, Officer Irwin Body-Worn Camera ("Ex. G-2") at 1:15-25.

[16] *Id.* at 1:28-31.

[17] *Id.* at 1:31-32.

do you mean? No."[18] Defendant glanced at the passenger and mumbled something inaudibly, appearing to confirm his answer.[19] When asked about the exchange at the hearing, Officer Irwin testified as follows:

> Q Okay. So you tell Mr. Brown why you pulled him over. What happens at that point?
>
> A So at that point he has paperwork in his hands. I asked him about weapons in the car, his voice appears to get high-pitched, almost cracks. He says, no, I don't think so. At this time of holding paperwork, he's almost—he's nervously looking back at me and the paperwork and then me.
>
> ….
>
> Q How did he appear to you?
>
> A So when I approached, he has paperwork in his hand. . . . I asked for paperwork. He's looking at me, looking at the paperwork, looking at me, looking at the paperwork. I asked if there's any weapons in the car. He said, "No, I don't think so."[20]

Although the Court finds that Defendant said, "I don't think so," it does not credit Officer Irwin's testimony that Defendant's answer was in reference to whether there were firearms in the truck. There are two reasons for this. First, the body-worn camera footage shows that Defendant begins to say, "I don't think so" before he can hear the second question.[21] Second, Officer Irwin's unsupported testimony that Defendant spoke with a "high-pitched, almost crack[ing]" voice, which is plainly contradicted by video,[22] diminishes the reliability of his account of this exchange. The Court finds that Defendant said, "I don't think so" in response to the first question, "Either one of you guys licensed to carry?"

---

[18] *Id.* at 1:33-35.

[19] *Id.* at 1:35-37.

[20] Hr'g Tr. at 26, 27 [Doc. No. 41].

[21] Ex. G-2 at 1:31.

[22] *Id.* at 1:25-40.

10. While answering the questions, Defendant held an Enterprise Rent-A-Car rental agreement in his left hand and two cards in his right hand—a "JETRO" business card and a red credit card.[23]

11. At timestamp 1:39 of Officer Irwin's body-worn camera footage, Defendant moved the rental agreement to his right hand and then, holding the agreement and the cards, reached toward the window.[24]

12. At timestamp 1:41, Officer Irwin reached toward the three items that Defendant was passing and retrieved the JETRO business card.[25]

13. At timestamp 1:44, Defendant corrected the mistake by handing Officer Irwin his driver's license.[26] Officer Irwin shared a friendly laugh with Defendant over the card mix-up.[27]

14. Officer Irwin later testified that Defendant's behavior made him suspect there was a firearm in the truck.[28] He testified that Defendant showed signs of nervousness by confusing a business card with his driver's license, breaking eye contact, and exhibiting accelerated breathing.[29] The Court does not find credible Officer Irwin's testimony that Defendant exhibited nervousness. For one thing, while Defendant quickly looked at his paperwork several times from timestamp 1:15 to 2:00, he consistently looked up at Officer Irwin to address him and spoke clearly and alertly. Similarly, Officer Irwin's explanation that Defendant displayed a nervous breathing pattern is contravened by (1) his testimony that "[t]here's no such thing as a suspicious

[23] *Id.* at 1:25-40.

[24] *Id.* at 1:39.

[25] *Id.* at 1:41.

[26] *Id.* at 1:44.

[27] *Id.* at 1:45-50.

[28] Hr'g Tr. at 96 [Doc. No. 41].

[29] *Id.* at 62-63, 96-97.

breathing pattern,"[30] (2) camera footage not showing a change in breathing,[31] and (3) the fact that, notwithstanding his EMS experience, Officer Irwin did not examine Defendant's vitals.[32] Last, though Defendant extended his right hand with two cards that were not his license, the Court does not find that this alone establishes nervousness. After all, Defendant's behavior was not particularly unreasonable. He used his right hand not just to hold the two cards, but also to pass the rental agreement, which was sensible to prioritize since he had just answered that the truck was rented. At any rate, Defendant immediately fixed the card mix-up.[33]

15. Defendant stated that he had rented the truck two days prior and then handed Officer Irwin a copy of the Enterprise Rent-A-Car rental agreement, which listed the Vehicle Identification Number ("VIN").[34] For the third time, Officer Irwin inquired if there was a firearm in the car, asking, "No firearms inside the car or anything like that?" Defendant replied, "No."[35]

16. After receiving the rental agreement and the occupants' driver's licenses, the officers walked back to the patrol car. At this point, dispatch notified them by radio that the license plate number had still not returned a record and that the plate-verification system "possibly . . . may be temporarily down."[36] The dispatch officer requested that the officers share the VIN to facilitate an additional check.[37] Officer Johnson did not believe the system was down, as he had "been running cars" throughout the night.[38]

---

[30] Hr'g Tr. at 92 [Doc. No. 41].

[31] Gov't Ex. G-2 at 1:15-2:00.

[32] Hr'g Tr. at 92, 97 [Doc. No. 41].

[33] Ex. G-2 at 1:38.

[34] *Id.* at 1:49-2:02; Hr'g Tr. at 115 [Doc. No. 41].

[35] Ex. G-2 at 1:50-2:00.

[36] Hr'g Tr. at 28, 129 [Doc. No. 41]; Ex. G-2 at 2:00-10.

[37] Ex. G-2 at 2:00-10.

[38] *Id.* at 2:18-22; Hr'g Tr. at 28-29 [Doc. No. 41].

17. Back in the patrol car, the officers used the MDT to search the operator's license numbers ("OLNs") of Defendant and the passenger, leading them further to assume that the license-plate verification system was operational.[39] As they explained, the system used to verify an OLN is connected with the plate verification system because in both cases the searches query a common set of databases.[40]

18. In another bid to retrieve information on the truck, the officers did a database search at 8:25 p.m. using the VIN.[41] But while the MDT returned the truck's make, model, year, and other information, it also read, "No vehicle found for VIN," indicating a lack of any registration information.[42] After receiving the VIN at 8:26 p.m., Dispatch attempted a VIN-based search at 8:27 p.m. but was also unable to verify whether the truck was registered.[43] The dispatch officer communicated to Officer Irwin that the initial VIN check was inconclusive but added that she would attempt to check the VIN in another system.[44]

19. When checking the occupants' criminal histories, the officers discovered that Defendant had a prior arrest for homicide and that the passenger had been charged or arrested for aggravated assault involving a firearm.[45] Before returning to the truck, the officers discussed that Defendant said "I don't think so" when Officer Irwin had asked if there was a firearm in the

---

[39] Hr'g Tr. at 29-30 [Doc. No. 41].

[40] *Id.*

[41] Hr'g Tr. at 115 [Doc. No. 41].

[42] Ex. G-1 at 20:25:21; Hr'g Tr. at 130 [Doc. No. 41].

[43] Ex. G-2 at 4:35-50, 5:50-6:00; Ex. G-1 at 20:27:12.

[44] Ex. G-2 at 5:50-6:00.

[45] Hr'g Tr. at 33, 131 [Doc. No. 41].

truck.[46] As Officer Irwin opened the patrol car door to walk back, he said, "we're going to find out" and explained that he was planning to place Defendant in the patrol car.[47]

20. Upon returning to the truck at 8:28 p.m., Officer Irwin opened the driver's side door and instructed Defendant to exit.[48] Defendant "passively resist[ed],"[49] asking repeatedly, "what is the probable cause to search?"[50] Officer Irwin replied that "probable cause is the car stop."[51] This exchange continued for approximately 32 seconds,[52] and then Officer Irwin reached across Defendant to unbuckle his seatbelt.[53] After 20 more seconds passed, Officer Irwin grabbed Defendant's arm and urged him to leave the truck.[54] The argument continued for another 45 seconds, with Officer Irwin asking him to get out of the truck countless times. Officer Irwin eventually called for backup, and Defendant finally exited as backup officers arrived.[55] In total, around 1 minute and 35 seconds elapsed from the first exit order until Defendant stepped out of the truck.

21. Once Defendant was outside of the truck, the officers handcuffed him and escorted him to a position near the patrol car, where Officer Johnson conducted a frisk.[56] The officers recovered nothing from the frisk and placed Defendant in the patrol car's backseat.[57]

---

[46] Ex. G-2 at 6:20-32.

[47] *Id.* at 6:27-32; Hr'g Tr. at 132 [Doc. No. 41].

[48] Ex. G-2 at 6:45-50.

[49] Hr'g Tr. at 34 [Doc. No. 41].

[50] Ex. G-2 at 6:50-7:22.

[51] *Id.* at 7:01-03; *see id.* at 7:38-39 ("this is a car stop.").

[52] *Id.* at 6:50-7:22.

[53] *Id.* at 7:22.

[54] *Id.* at 7:22-42.

[55] *Id.* at 7:42-8:27; Hr'g Tr. at 35 [Doc. No. 41].

[56] Ex. G-2 at 8:27-9:35.

[57] Ex. G-2 at 9:35-42; Hr'g Tr. at 37 [Doc. No. 41].

22. Meanwhile, when Officers Irwin and Johnson were bringing Defendant to the patrol car, backup officers removed the passenger from the truck.[58] As Officer Irwin walked back from the patrol car to the truck, he received a radio message that the backup officers had recovered a firearm off the passenger's person.[59]

23. Officer Irwin then scanned under the truck driver's seat with a flashlight and did not see anything. Looking further, he found a firearm (Big Sauer P220 with serial number G306404) wedged between the console and the driver's seat.[60] The firearm was located at 8:31 p.m. Another officer exclaimed, "the streak continues," referring to the fact that Officers Irwin and Johnson had recovered other illegal firearms that week.[61]

24. At 8:33 p.m., the officers received an update from dispatch confirming that New York's DMV system was "up and running again" and that the truck was a rental vehicle properly registered in New York.[62]

25. The officers placed Defendant under arrest for possessing a concealed firearm without a license.[63]

26. When later reviewing the MDT's CAD reports, Officer Johnson noted that, other than the "TEMPORARILY UNAVAILABLE" line, the CAD report output prompting the stop was "practically identical" to "NO RECORD" returns associated with unregistered vehicles.[64]

---

[58] Hr'g Tr. at 37 [Doc. No. 41].

[59] That Officer Irwin knew the other gun was recovered before frisking the truck is supported by his testimony, *id.*; his statement, "you hear that?" at timestamp 9:47 of his body-worn camera footage; and Officer Johnson's statement at timestamp 9:56 where he already seems to know the firearm was recovered by his colleagues before processing the radio message heard at timestamp 9:55.

[60] Ex. G-2 at 9:50-10:02; Hr'g Tr. at 38-39 [Doc. No. 41].

[61] Hr'g Tr. at 46 [Doc. No. 41].

[62] Ex. G-2 at 12:14-24; Hr'g Tr. at 47 [Doc. No. 41].

[63] Gov't Ex. G-4, Arrest Memo ("Ex. G-4").

[64] Hr'g Tr. at 165-66 [Doc. No. 41].

## II. Discussion

In seeking to suppress the firearm, Defendant challenges the initial stop, the officers' prolongation of it, and Officer Irwin's sweep of the front seating area. The Court considers each issue in turn.

### A. Initial Traffic Stop

The Fourth Amendment guarantees a right to be free from "unreasonable searches and seizures."[65] A traffic stop, however brief, is a seizure under the Fourth Amendment and must "not be 'unreasonable' under the circumstances."[66] Traffic stops will be permitted if an officer has a reasonable suspicion to believe that a traffic violation occurred.[67] "Courts must review reasonableness through an objective lens and should not consider the actual or subjective intentions of the officers involved."[68] A court must further examine the totality of the circumstances and ask only "whether specific, articulable facts produced by the officer would support reasonable suspicion of a traffic infraction."[69] "Reasonable, articulable suspicion is 'a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.' "[70]

The government argues that the facts gave rise to a reasonable, articulable suspicion that the truck was operated in violation of Pennsylvania's vehicle registration statute.[71] Defendant

[65] U.S. Const. amend. IV.

[66] *Whren v. United States*, 517 U.S. 806, 810 (U.S. 1996).

[67] *United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018) (citing *Navarette v. California*, 572 U.S. 393 (2014)).

[68] *United States v. Hunter*, 88 F.4th 221, 224 (3d Cir. 2023) (citations omitted).

[69] *United States v. Delfin-Colina*, 464 F.3d 392, 397-98 (3d Cir. 2023).

[70] *Id.* at 396 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

[71] Gov't Opp'n Def.'s Mot. Suppress Evid. ("Gov't Opp'n") at 8-10 [Doc. No. 25]; 75 Pa. Cons. Stat. § 1301(a).

disagrees. First, he contends that the truck's physical condition was unassailable.[72] Second, he submits that the officers' experience interpreting "NO RECORD" messages could not have raised a reasonable suspicion based on the accompanying message reading, "TEMPORARILY UNAVAILABLE: HOST COMMUNICATIONS FAILURE."[73]

While a close call, the Court agrees with the government. On the totality of the circumstances, the facts attested to support a suspicion that the truck was unregistered. With around three years of patrol experience each at the time of the stop, Officers Irwin and Johnson had conducted countless vehicle stops.[74] They explained from experience that "NO RECORD" messages are associated with vehicles that are unregistered or, worse, stolen or carjacked.[75] Officer Irwin in fact described that these so-called "NO RECORD" vehicles turn out unregistered "[m]ost of the time."[76] Although neither the truck nor its license plate exhibited damage or suspicious signatures, the officers testified that "NO RECORD" messages often result in the vehicle being unregistered absent those imperfections.[77] It is immaterial that the officers' suspicion was proven false because they "produc[ed] facts establishing that [they] reasonably believed that a violation had taken place."[78]

[72] Hr'g Tr. at 167-68 [Doc. No. 41].

[73] Def.'s Mot. Suppress Evid. ("Def.'s Mot.") at 7 [Doc. No. 20].

[74] Hr'g Tr. at 28 [Doc. No. 41].

[75] *Id.* at 16, 124-25.

[76] *Id.* at 56-57.

[77] *Id.* at 151.

[78] *Delfin-Colina*, 464 F.3d at 398 ("[A]n officer need not be factually accurate in her belief that a traffic law has been violated" for a roadside seizure to be permitted); *see also United States v. Hollins*, 685 F.3d 703, 707 (8th Cir. 2012) (upholding traffic stop based on a mistaken belief that the vehicle was unregistered); *United States v. Miranda-Sotolongo,* 827 F.3d 663, 669 (7th Cir. 2016) (officer had reasonable suspicion to stop vehicle with temporary tags after database check found no record of registration).

The "TEMPORARILY UNAVAILABLE" note did not affect this. It appeared eight lines below the "NO RECORD" field, and neither officer claimed to see it. This was an oversight, to be sure, but not an objectively unreasonable one. The officers have experience using "NO RECORD" messages to test if a vehicle is unregistered, and, other than the "TEMPORARILY UNAVAILABLE" line, the data returned was "practically identical" to what they rely on.[79] To the extent the officers' observation and understanding of the CAD Report was incomplete, their suspicion that the truck was unregistered was still supported by reasonable inferences drawn from their experience.[80]

In view of the circumstances, the "NO RECORD" message created a reasonable, articulable suspicion that Defendant was operating an unregistered vehicle. The initial stop was justified.

**B. Whether the Stop Was Prolonged in Violation of the Fourth Amendment**

Defendant next argues that the officers prolonged the traffic stop in violation of the Fourth Amendment by detouring from the stop's mission.[81] For support, he relies on *Rodriguez v. United States*[82] and *Illinois v. Caballes*.[83] The government responds that, to the extent that the officers veered off mission, that diversion did not prolong the stop and was supported by reasonable suspicion in any case.[84]

---

[79] Hr'g Tr. at 165-66 [Doc. No. 41].

[80] *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (officers may "draw on their own experience . . . to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." (internal quotations omitted)); *Hollins*, 685 F.3d at 706 ("Even an officer's incomplete initial observations may give reasonable suspicion for a traffic stop.").

[81] Def.'s Mot. at 7-8 [Doc. No. 20].

[82] 575 U.S. 348 (2015).

[83] 543 U.S. 405 (2005); Def.'s Mot. at 7-8 [Doc. No. 20].

[84] Gov't Opp'n at 11-12 [Doc. No. 25].

Even if lawful at its inception, a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete the mission."[85] A traffic stop's mission includes ordinary inquiries such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."[86] Also part of the stop's mission are tasks related to officer safety that are "done out of an interest to protect officers."[87] This category of permissible conduct includes:

> ordering drivers and passengers out of the car, even in the absence of any articulable suspicion of possible danger, "asking limited questions directed at ensuring officer safety," conducting "routine criminal record checks," even if they take several minutes, and other "negligibly burdensome precautions" reasonably taken to safely complete the stop, as well as "delays caused by safety concerns related to the stop."[88]

"In contrast, 'measures aimed at detecting ordinary criminal wrongdoing,' . . . 'safety precautions taken in order to facilitate' on-scene 'investigation into other crimes,' and other fishing expeditions fall outside the scope of the stop's mission."[89] When an officer "measurably prolongs a stop" to investigate crime—a crossroads termed the "*Rodriguez* moment"—he must develop " 'reasonable suspicion' of criminal activity independent of the traffic violation itself."[90] If not, the stop transforms into an unlawful seizure.[91]

In *Ross*, the Third Circuit summarized the test as follows: "Under *Rodriguez*, . . . an unlawful seizure occurs when an officer (1) diverts from the infraction-and-safety-based mission

---

[85] *Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

[86] *Id.* at 355.

[87] *United States v. Clark*, 902 F.3d 404, 410 (3d Cir. 2018).

[88] *United States v. Ross*, 151 F.4th 487, 495 (3d Cir. 2025) (alterations omitted) (quoting *United States v. Cortez*, 965 F.3d 827, 838 (10th Cir. 2020) (first quote); *Hunter*, 88 F.4th at 225-26 (second); *Rodriguez*, 575 U.S. at 356 (third); and *United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020) (fourth)).

[89] *Id.* (quoting *Rodriguez*, 575 U.S. at 355-56).

[90] *Id.*

[91] *Id.* at 495-96.

of the stop to investigate other criminal conduct, (2) in a way that meaningfully prolongs the stop, and (3) the investigative detour is unsupported by any independent reasonable suspicion."[92]

1. Diversion from the Initial Mission

Under this three-part test, the first issue is whether the officers detoured from the stop's mission. The Court finds that they did.

The encounter first proceeded as a routine traffic stop. The officers explained the basis for the stop, asked about firearms to assure their safety, and requested documents to investigate the suspected violation. They returned to the patrol car to do additional checks, including of the occupants' OLNs and the truck's VIN, and ran the occupants' criminal histories.[93]

But the tone of the stop eventually shifted. Still in the patrol car, Officer Irwin suggested Defendant might have a gun since he had said, "I don't think so" in response to questioning about firearms.[94] Officer Irwin added, "we're going to find out," and told Officer Johnson that Defendant would be put in the patrol car.[95] On returning to the truck, Officer Irwin ordered Defendant to exit and, following the 1 minute and 35 seconds of toil, managed to have Defendant step out. In what followed, there can be little doubt that the officers diverted from the traffic- and safety-related purposes of the stop. Officer Irwin handcuffed Defendant and guided him toward the patrol car, and Officer Johnson frisked him for weapons. Like the dog sniff in *Rodriguez*, these measures were "aimed at detecting evidence of ordinary criminal wrongdoing,"[96] so they

---

[92] *Id.* at 496.

[93] *See Hunter*, 88 F.4th at 226 (recognizing a criminal history check is a justifiable safety precaution).

[94] Ex. G-2 at 6:10-20.

[95] *Id.* at 6:27-32.

[96] *Rodriguez*, 575 U.S. at 356 (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000)).

constituted a diversion from the original purpose of the stop. The first prong of the *Ross* test is satisfied.

As it relates to pinpointing a *Rodriguez* moment, Defendant suggests that the officers went off mission when they re-engaged Defendant and ordered him to exit the vehicle.[97] At the latest, the Court would infer that the investigative detour commenced a moment later when Defendant was handcuffed, just before the frisk. But there is also reason to think that the detour happened when Officer Irwin gave the exit order. While officer safety generally justifies ordering occupants out of a vehicle,[98] *Rodriguez* observed that "safety precautions taken in order to facilitate . . . detours" will constitute diversions from the stop's mission.[99] As a result, some courts have found that pretextual exit orders are detours that require independent reasonable suspicion.[100] Nevertheless, the Court need not decide when the detour began—the *Rodriguez* moment—because, as discussed next, the second part of the *Ross* test is not met.

2. <u>Meaningful Prolongation of the Stop</u>

Having found an off-mission detour occurred, the Court asks whether it "measurably extended the duration of the stop."[101] A measurable extension occurs if the stop "is prolonged beyond the time reasonably required to complete [its] mission."[102] In *Rodriguez*, for instance, an

[97] Def.'s Mot. at 8 [Doc. No. 20].

[98] *Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977).

[99] *Rodriguez*, 575 U.S. at 356.

[100] *See United States v. Whitley*, 34 F.4th 522, 530 (6th Cir. 2022); *Baxter v. Roberts*, 54 F.4th 1241, 1265 (11th Cir. 2022); *United States v. Wrobel*, 295 F. Supp. 3d 1127, 1134-35 (D. Idaho 2018). *But see United States v. Baker*, 108 F.4th 1241, 1248-49 (10th Cir. 2024) (crediting district court finding that the exit order was aimed at ensuring officer safety).

[101] *Rodriguez*, 575 U.S. at 355 (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).

[102] *Id.* at 354 (quoting *Caballes*, 543 U.S. at 407).

officer prolonged the traffic stop where, outside of the time needed to complete ordinary business, he conducted a dog sniff of the car to search for drugs.[103]

" 'Fleeting' off-mission inquiries lasting 'mere seconds' typically will 'not measurably prolong the stop,' " but "as more seconds tick by . . . the risk of unlawful prolongation increases."[104] Further, even if officer conduct is unrelated to the traffic-based premise for the stop, that does not necessarily lengthen the roadside seizure. For example, investigation into potential crimes will not lengthen the traffic stop when occurring " 'simultaneously with tasks that fall within the mission of the traffic stop,' such as when the officer is multitasking."[105] Nor will the stop be prolonged where one officer diligently performs traffic-related tasks while another veers into an off-mission investigation.[106]

Furthermore, off-mission conduct does not lengthen the stop if it transpires while the officer waits for a routine record check to be completed. In other words, an officer may pursue detours "to his heart's content, provided he does so during the supposedly dead time while he or another officer is completing a task related to the traffic violation."[107] Several appellate decisions illustrate this principle. In *Collazo*, an officer pulled over a van for too closely tailing the trailer

[103] *Id.* at 352, 357-58.

[104] *Ross*, 151 F.4th at 495 (quoting *United States v. Taylor*, 60 F.4th 1233, 1239 (9th Cir. 2023)).

[105] *Id.* (quoting *United States v. Steinman*, 130 F.4th 693, 707 (9th Cir. 2025), *withdrawn and superseded on denial of reh'g en banc*, 159 F.4th 550 (9th Cir. 2025)).

[106] *Id.* (citing *Johnson*, 555 U.S. at 333).

[107] *United States v. Howard*, 815 F. App'x 69, 75 (6th Cir. 2020) (quoting *United States v. Everett*, 601 F.3d 484, 492 (6th Cir. 2010), *abrogated on other grounds by Rodriguez*, 575 U.S. at 357 (showing that cases like *Everett* are abrogated only to the extent they allowed "de minimis" extensions of the period needed to complete the stop)); *United States v. Collazo*, 818 F.3d 247, 258 (6th Cir. 2016); *United States v. Steinman*, 159 F.4th 550, 563 (9th Cir. 2025), *cert. den'd*, 2026 WL 1640844 (June 8, 2026); *United States v. Purcell*, 236 F.3d 1274, 1278 (11th Cir. 2001). To be clear, this is not to say that while traffic-related tasks are diligently carried out, an officer has discretion to probe for crimes however he pleases. If, for example, an officer unlawfully searches a vehicle, conducts an illegal frisk, or effectuates an arrest without probable cause, those actions are still subject to discrete challenge even if they did not lengthen the stop.

in front of it.[108] Two minutes into the stop, the officer told the driver that he was going to run a driver's license check and retrieve a citation book.[109] Over fourteen minutes passed before "dispatch called back" with information on the license check and, during that period, the officer asked about the driver's travel, "engaged in a general conversation," and posed questions to the driver's wife, including about "if she had ever been arrested for narcotics."[110] Regardless of whether the questioning deviated from the mission of the traffic stop, the Sixth Circuit observed that the questioning was not an unreasonable extension of the stop as it occurred in the dead time while the officer was waiting on dispatch to complete the license check.[111]

Similarly, in *Steinman*, a state trooper posed questions that were arguably outside the purview of a speeding stop.[112] The Ninth Circuit held that, to the extent these questions were off-mission, there was no Fourth Amendment violation because "they took place while [the trooper] was in the process of filling out the citation or while he was waiting for the results of [a permissible] criminal history check."[113] And, in *Purcell*, the Eleventh Circuit held analogously, concluding that a roadside detention was not measurably extended when the officer pursued a consent search while waiting on the results of a computerized check.[114]

Here too, the off-mission investigation of firearm possession occurred while the officers were waiting for a routine verification process to resolve. This process began at 8:26 p.m. when Officer Irwin read off the VIN by radio, requesting that dispatch verify whether the VIN matched

[108] *Collazo*, 818 F.3d at 250-51.

[109] *Id.* at 251.

[110] *Id.*

[111] *Id.* at 258.

[112] *Steinman*, 159 F.4th at 563.

[113] *Id.* at 563-64.

[114] *Purcell*, 236 F.3d at 1278. As *Purcell* demonstrates, the "dead time" principle applies to all off-mission intrusions, not just officer questioning.

a registered vehicle.[115] The dispatch officer reported at 8:27 p.m. that the information on the VIN was inconclusive but told Officer Irwin that she would run the VIN in another system.[116] Dispatch eventually confirmed that the vehicle was registered in New York's DMV system at 8:33 p.m.[117] It was in the interim when the investigative detour started and finished. Assuming the officers went off mission when Officer Irwin "re-engaged Defendant," the detour began at 8:28 p.m.[118] It then ended at 8:31 p.m, when Officer Irwin recovered the firearm at issue.[119] In short, as in *Collazo*, *Steinman*, and *Purcell*, the officers' detour was co-extensive with dead time needed to satisfy a routine record check.

Defendant disputes this, arguing that the time needed to reasonably complete the stop had elapsed by 8:28 p.m., when Officer Irwin ordered Defendant out of the truck.[120] To explain why, he points to the rental agreement he provided, the New York registration sticker that the officers missed, and the statement from dispatch that "possibly" the MDT plate-verification system "may be temporarily down."[121] But the Court disagrees that the necessary time was cut this short. It is rare for reasonable suspicion to immediately dissipate so as to bar routine inquiries relating to the suspected violation and officer safety.[122] When suspicion quickly dissipates, that is often due to a perceptual error, like when an officer stops a vehicle for an illegible registration sticker only to see from close-up that the sticker is legible and valid.[123]

---

[115] Ex. G-2 at 4:35-50.

[116] *Id.* at 5:50-6:00.

[117] *Id.* at 12:14-24.

[118] *Id.* at 6:49.

[119] *Id.* at 10:01.

[120] Def.'s Mot. at 7-8 [Doc. No. 20].

[121] Ex. G-2 at 2:00-07.

[122] *See generally* Wayne R. LaFave, Search & Seizure § 9.3(g) (6th ed. 2025).

[123] *Id.*; *see United States v. McSwain*, 29 F.3d 558, 560-61 (10th Cir. 1994).

There was no such occurrence here: the officers did not make an erroneous perception. On the contrary, it was reasonable for the officers to remain skeptical of the truck's registration, as they were justified in questioning the rental agreement[124] and did not receive confirmation that their MDT system malfunctioned until 8:33 p.m. Likewise, without seeing the New York registration sticker, it was not unreasonable to instead verify registration using the VIN that they did receive. Such registration checks are plainly accepted by the Third Circuit and Supreme Court.[125] Although the database check was complicated by a technical malfunction, its seven-minute duration was not unreasonable.[126]

In summary, the officers' off-mission investigation into the presence of illegal firearms did not measurably prolong the stop beyond the "time reasonably required to complete [its] mission."[127] The second prong of the *Ross* test is not satisfied. Therefore, the stop did not transform into an illegal seizure, and *Rodriguez* does not apply.[128]

**C. Protective "Frisk" of the Truck**

Finally, Defendant challenges the lawfulness of Officer Irwin's "frisk" of the truck's front seating area (i.e., the passenger compartment).[129] "[T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or

---

[124] *See United States v. Garrido-Santana*, 360 F.3d 565, 573 (6th Cir. 2004) ("[E]ven if the rental agreement reasonably appeared to authorize defendant as . . . [a] driver, a reasonable police officer would still have good reason to run a license plate check. For example, [the] defendant may have forged that authorization, or the rental company may have rescinded such authorization, even if initially valid, due to a violation of the rental agreement.").

[125] *United States v. Stewart*, 92 F.4th 461, 467 (3d Cir. 2024); *Rodriguez*, 575 U.S. at 355.

[126] *Garner*, 961 F.3d at 272 (routine records check can last 15 minutes); *United States v. Barrigan*, 379 F.3d 524, 527-29 (8th Cir. 2004) (stop with 40-minute computerized record check was not of impermissible length); *Byndloss v. State*, 893 A.2d 1119, 1121, 1137 (Md. 2006) (stop of roughly 30 minutes due to delay from computer-related difficulties was not unreasonable).

[127] *Rodriguez*, 575 F.3d at 354.

[128] Resultingly, the Court need not dwell on the third prong of *Ross*—whether there was independent reasonable suspicion for the investigative detour at the time it began.

[129] Def.'s Mot. at 8-11 [Doc. No. 20].

hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the suspect is dangerous and may gain immediate control of weapons."[130] As explained, an evaluation of reasonable suspicion turns on "the totality of the circumstances—the whole picture."[131]

Officers Irwin and Johnson testified that Defendant exhibited behavior that raised their suspicion. As a preliminary matter, some of this testimony is difficult to square with the body-worn camera footage. For instance, Officer Irwin testified that Defendant showed signs of nervousness by breaking eye contact, accelerating his breathing, and fumbling with paperwork.[132] But the video displays that he made eye contact when addressing Officer Irwin, exhibited no "fumbling" except for an inconsequential card mix-up, and portrayed no change in breathing.[133] Also, while Officer Irwin testified that Defendant was "not able to answer simple questions of if there's a firearm or not,"[134] the video says otherwise. It shows that Defendant said, "I don't think so" in response to whether he was licensed to carry a firearm,[135] so the Court will ascribe only minimal weight to that remark.

Notwithstanding these inconsistencies, when Officer Johnson frisked Defendant outside the patrol car, the objective factors relevant for consideration were that (1) it was nighttime; (2) the officers were in a high-crime area where they had recently recovered illegal firearms; (3) Defendant refused to exit the vehicle when asked; (4) Defendant and the passenger had arrest

---

[130] *Maryland v. Buie*, 494 U.S. 325, 332 (1990) (quoting *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983)).

[131] *United States v. Cortez*, 449 U.S. 411, 417 (1981).

[132] Hr'g Tr. at 62-63, 96-97 [Doc. No. 41].

[133] Ex. G-2 at 1:15-2:00.

[134] Hr'g Tr. at 96 [Doc. No. 41].

[135] Ex. G-2 at 1:25-31.

records connected to violent crimes; (5) the officers reasonably doubted whether the truck was registered and, based on training and experience, believed it could be stolen; and (6) Defendant said "I don't think so" when answering whether he was licensed to carry. These factors, standing alone, may not have yielded reasonable suspicion of Defendant's access to a firearm.[136] However, before "frisking" the truck, Officer Irwin learned a firearm was recovered from the passenger.[137] That realization made it reasonable for him to doubt the truthfulness of Defendant's earlier statements and suspect that other firearms were concealed. Viewed in their totality, the circumstances thus became sufficient to establish a reasonable suspicion that Defendant was dangerous and could access a firearm if permitted to re-enter the truck. The truck "frisk" was lawfully justified.

## III. Conclusions of Law

1. Officers Irwin and Johnson had reasonable, articulable, and individualized suspicion to conduct the initial stop based on observing a "NO RECORD" message on the MDT.

2. Although the officers' investigation of unlawful firearm possession detoured from the stop's initial mission, that detour did not meaningfully lengthen the roadside detention, so *Rodriguez v. United States* does not apply.

3. The "frisk" of the truck's front seating area was supported by a reasonable, articulable, and individualized suspicion that Defendant was dangerous and might obtain immediate control of weapons.

---

[136] *United States v. Dorsey*, No. 25-2508, 2026 WL 2075571, at *3 (3d Cir. July 17, 2026) (failure to comply, puzzling answers to questions, and request to leave are insufficient for reasonable suspicion). *But see Wardlow*, 528 U.S. at 125 (officers had reasonable, articulable suspicion of criminal activity based on the defendant's unprovoked flight in a high-crime area); *Green*, 897 F.3d at 187 ("Though a criminal record, much less an arrest record, is not sufficient to establish reasonable suspicion, it is a valid factor.").

[137] Hr'g Tr. at 37-38 [Doc. No. 41]; Ex. G-2 at 9:40-54.

## IV. CONCLUSION

For the reasons set out above, Defendant's motion to suppress will be denied. An order will follow.